IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14673

_____

D.C. Docket No. 5:13-cv-00113-ACC-PRL


AMY YOUNG,
as Co-Personal Representative of the
Estate of Andrew Lee Scott, deceased,
JOHN SCOTT,
as Co-Personal Representative of the
Estate of Andrew Lee Scott, deceased,
MIRANDA MAUCK,
individually,

                                                    Plaintiffs-Appellants,

versus

GARY S. BORDERS,
in his official capacity as Sheriff of Lake County, Florida,
RICHARD SYLVESTER,
in his individual capacity,

                                                    Defendants-Appellees.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

Before ED CARNES, Chief Judge, TJOFLAT, HULL, MARCUS, WILSON, WILLIAM PRYOR, MARTIN, JORDAN, ROSENBAUM, JULIE CARNES, and JILL PRYOR, Circuit Judges.

BY THE COURT:

A petition for rehearing having been filed and a member of this Court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting a rehearing en banc, it is ORDERED that this case will not be reheard en banc.

HULL, Circuit Judge, joined by TJOFLAT, Circuit Judge, concurring in the denial of rehearing en banc:

A majority of the Court has voted not to rehear en banc the panel's non-published, and thus non-precedential, decision. The district court entered a thorough (44-page) order granting qualified immunity to the defendant, Deputy Sylvester, in this § 1983 police-shooting case. In its summary decision, the panel found "no reversible error" in the district court's qualified immunity rulings, stating in full:

> After review of the record and with the benefit of oral argument by counsel for the parties, this Court finds no reversible error in the district court's September 18, 2014 order (1) granting defendants Sheriff Gary S. Borders and Deputy Richard Sylvester's motion for summary judgment with respect to all of plaintiffs Amy Young, John Scott, and Miranda Mauck's 42 U.S.C. § 1983 claims against Sheriff Borders, in his official capacity as Sheriff of Lake County, Florida, and Deputy Sylvester, in his individual capacity, and state law claims for wrongful death of the decedent, Andrew Scott, assault of Mauck, and false imprisonment of Mauck, and (2) denying plaintiffs Young, Scott, and Mauck's motion for partial summary judgment with respect to their § 1983 claims against defendant Borders. We echo the district court's expression of sympathy for the plaintiffs' loss, but while the facts of this case are tragic, we can find no reversible error in the district court's ultimate qualified immunity rulings. Accordingly, we must affirm the district court's final judgment in favor of the defendants on all of plaintiffs' claims.

This case is not en-banc worthy because the panel's decision is correct and establishes no circuit precedent.

Although orders denying rehearing en banc also have no precedential effect, our colleagues have written two lengthy dissents to this order denying rehearing en

3

banc.  Two of the original panel members now write to explain the errors in those dissents.

First, although the district court ruled that Deputy Sylvester's conduct violated no "clearly established law" as of July 15, 2012, the dissents fail to identify any cases with facts similar to the undisputed facts here, much less any similar cases where an officer was held to have violated the Fourth Amendment. See White v. Pauly, 580 U.S. ___, ___, 137 S. Ct. 548, 552 (2017) (per curiam) (admonishing that, in qualified immunity cases, "clearly established law should not be defined at a high level of generality," "must be 'particularized' to the facts of the case," and must give "fair and clear warning" to officers that their conduct is unlawful under the Fourth Amendment).

Second, the dissents omit key, undisputed facts in their recitations of what defendant Deputy Sylvester saw, was told, and then did on this night when he tragically shot and killed Mr. Scott, an innocent young man.  Here are the complete facts that show what happened that summer night and why the panel properly found no reversible error in the district court's qualified immunity ruling.

## I.    FACTUAL BACKGROUND

We review an order granting summary judgment de novo, viewing the facts of the case in the light most favorable to the party opposing the motion.  Vinyard v. Wilson, 311 F.3d 1340, 1346 n.7 (11th Cir. 2002).  We therefore recite the facts in

the light most favorable to the plaintiffs, even though the defendants dispute the plaintiffs' version of the events.  Id. at 1343 n.1.[1]

## A.     After Chasing a Motorcycle Speeding at 90 mph, Deputy Sylvester Finds the Still-Hot Motorcycle in Front of Apartment 114 (where Mr. Scott Resided).

Sometime after 1:00 a.m. on July 15, 2012, defendant Deputy Sylvester was in his squad car and spotted a motorcycle driving upwards of 90 mph, well in excess of the posted speed limit.  After making a U-turn to pursue it, Deputy Sylvester maintained sight of the motorcycle and watched it race down U.S. 441 before turning left onto County Road 44.  Sylvester followed, also turning onto 44.  He soon lost sight of the motorcycle.

Deputy Sylvester radioed dispatch to report that he had pursued and lost sight of the motorcycle.  Sylvester reports that dispatch advised the motorcyclist might be the same person being sought by the Leesburg Police Department and he might have a pistol.  Shortly thereafter, Sylvester received a radio message from Corporal David McDaniel reporting that he had "probably located the motorcycle at the Blueberry Hill apartments."

Corporal McDaniel had heard Deputy Sylvester's report about the speeding motorcycle and checked out a few places in the Leesburg area.  One place was the

---

[1]The only defendant sued in his individual capacity is Deputy Sylvester.  None of the other officers with him were sued.  Because the dissents focus on the claims against defendant Sylvester, we do too.

Blueberry Hill apartment complex located about a mile from where Sylvester originally spotted the 90 mph speeding motorcycle. When McDaniel pulled into the complex, McDaniel noticed a parked motorcycle and could "hear the motorcycle's motor still popping and crackling because it was hot." McDaniel notified Sylvester of his discovery.

Contemporaneously, Deputy Joseph Brocato, who was five miles away from Blueberry Hill, overheard on the Leesburg police radio channel that a "motorcycle had fled from them and the matter also involved an assault and battery with a loaded firearm." Brocato heard that the Leesburg police had lost the motorcycle and had called off the pursuit. Brocato then heard Sylvester's report of a speeding motorcycle, and, given their physical proximity, Brocato wondered if both reports involved the same motorcycle. Shortly thereafter, Brocato overheard Corporal McDaniel's message about the motorcycle at Blueberry Hill. Brocato went to the Blueberry Hill complex where McDaniel was. When he arrived, Brocato "looked at the motorcycle," and "[i]ts engine was still hot."

After receiving Corporal McDaniel's message, Deputy Sylvester drove to Blueberry Hill. As he pulled into the complex, McDaniel and Deputy Brocato were already there, and Sylvester identified the suspect motorcycle as the one he had pursued and lost earlier. Sylvester said "[t]he motorcycle's engine was still warm, as was the headlight."

6

In his deposition, Deputy Sylvester was asked: "Were you able to positively identify that motorcycle as the motorcycle that had sped past you earlier?" Deputy Sylvester answered "Yes, sir." Deputy Sylvester also said that, while he could not identify the make and model, it was a dark-colored bike and "it was a sport-bike."

A fourth officer, Deputy Lisa Dorrier, arrived after hearing the motorcycle reports. Once gathered, Deputy Brocato shared with the group the radio reports about the Leesburg police's pursuit of a motorcyclist who was possibly armed.

In sum, the still-hot motorcycle parked in front of Apartment 114 appeared to be (1) the same 90 mph speeding motorcycle Deputy Sylvester had pursued and (2) the same motorcycle, as the Leesburg police had warned, of an armed suspect involved earlier in an assault and battery incident. These facts—about how and why the officers arrived at the motorcycle parked directly in front of Apartment 114 where Mr. Scott resided—are not disputed.

## B.    Officers Focus Attention on Apartment 114.

Next to the still-hot motorcycle, the officers noticed a Chevy TrailBlazer SUV. Corporal McDaniel ran the motorcycle's license tag number through the DAVID database and learned that the motorcycle was registered to "Jonathan Brown" at an address in Mount Dora, Florida. After running the Chevy's tag number, McDaniel learned that the Chevy was also registered to Brown at the same Mount Dora address. Deputy Brocato ran the license tag information too and

7

learned that both the Chevy and the motorcycle were registered to Brown. Although the Blueberry Hill complex was not in Mount Dora, both vehicles were registered to the same owner and parked side-by-side in front of Apartment 114.

Record photos show Apartment 114's exterior and the motorcycle and the Chevy parked near Apartment 114.



CC-PRL   Document 90-10   Filed 05/01/14   Page 3 of 8 PageID 2058

*(The door in the center of the photograph is the front door of Apartment 114. The number "114" appears to the right of the front door.)*

The officers noticed lights illuminated inside of Apartment 114 but not in nearby apartments. Deputy Sylvester observed a fresh footprint in the sand next to the motorcycle leading toward 114. Other officers do not recall seeing a footprint.

The officers decided to knock on doors in the complex, starting with Apartment 114, to try to gather information about the owner of the motorcycle. The officers could not be certain whether the armed motorcyclist was in 114 or in a

8

different apartment since they knew that the complex did not have assigned parking. The officers stated that the occupants were not suspects. Nonetheless, believing the man they were pursuing might be armed and might be in 114, the officers took "tactical positions" around the front door of 114 before knocking.

The uniformed officers parked their four patrol vehicles in plain view outside Apartment 114. There was a front window next to the front door of 114.

### C.    Officers Took Reasonable Safety Precautions

The officers' positions, before Deputy Sylvester knocked on the door to Apartment 114, are not disputed. Deputy Sylvester positioned himself to the left of the front door, near the exterior wall. Sylvester states that "[f]rom there, [he] could see whoever opened the door and they could see [him]." The front door is hinged on the left side of the doorframe and opens inward. Sylvester stood only a few feet from the front door—not on the stoop, but on the ground to the left of the stoop. Sylvester stood in a clear line of sight of anyone who might open the door. He held an illuminated "blue light" flashlight. Corporal McDaniel stood to the right of the front door with his right shoulder touching the exterior wall.

As the photo shows, a short privacy fence separates Apartment 114 from Apartment 115. Deputies Brocato and Dorrier stood in front of 115 on the other side of the fence separating them from Deputy Sylvester. Brocato could see only Sylvester's head over the fence. Other officers also held lit "blue light" flashlights.

9

Although only two of the four officers were in front of Apartment 114 as they took their positions, all four officers had their guns drawn.  Notably, Deputy Sylvester held his gun behind his leg and prepared to knock.  Sylvester states that he did not announce that he was with the Sheriff's Office because he was planning to try to speak with the occupants to see if he could obtain any information about the suspect owner of the motorcycle parked out front.

Deputy Sylvester began knocking on the front door of Apartment 114.  Viewed in the light most favorable to the plaintiffs, these were loud knocks.  A neighbor remembers that an officer "banged" on the door "just three times, just boom, boom, boom."  Mr. Scott and Plaintiff Mauck (his girlfriend) were inside the lit Apartment 114.  Mauck testified that the knocking sounded like "bang, bang, bang; wait; and then bang, bang, bang."  Mauck described the knocks as "scary" and "very startling."[2]

A resident inside Apartment 115 (next door) heard the knocking and opened his front door before Mr. Scott, in Apartment 114, opened his door.  Deputy Dorrier re-holstered her gun, went to 115's front door, and told the resident that the officers were looking for the owner of the motorcycle.  Dorrier reports that "[t]he man gestured with his right hand towards the building to his right and said, 'He lives over there.'"

---

[2]Plaintiff Mauck's testimony is consistent with Deputy Sylvester, who said: "I knocked on the door in two separate sets of three knocks each, waiting between each set for a response."

10

Deputy Sylvester overheard a portion of this conversation and remembers hearing the resident say, "He lives over there." This gave Sylvester the impression that the armed motorcyclist might be inside Apartment 114, although Sylvester did not see in which direction the resident pointed. Upon Deputy Sylvester's hearing "He lives over there," Sylvester saw 114's door suddenly open. The next events unfolded in a few seconds.

## D.    Deputy Sylvester's Split-Second Decision

Everyone agrees that the occupant, Mr. Scott, opened the door with a gun in his hand. Deputy Sylvester says the gun was pointed directly at him, but Plaintiff Mauck says Mr. Scott held his gun down by his side. We must credit the plaintiffs' version of events. Thus, only the fact that Mr. Scott held a gun and was only a few feet from Sylvester is undisputed. No one, however, contradicts Sylvester's testimony that Mr. Scott, with a gun in hand, moved and began backing away behind the door in a sudden movement that Sylvester perceived as an attempt to edge back and take cover "so he could fire on me."

The entire incident at the door took about two seconds. Although knocking to gather information, Deputy Sylvester then saw an occupant open the door with a gun and appear to move to fire, and Sylvester then made a split-second judgment that the person was the armed motorcyclist and presented an immediate danger of serious bodily harm. In mere seconds, this investigatory action turned tragic as

11

Sylvester shot and killed Mr. Scott, an innocent young man who was not the motorcyclist.

## II.    EXCESSIVE FORCE ANALYSIS

The district court emphasized the unsettling and difficult nature of this case:

> The facts giving rise to Plaintiffs' claims present a tragic story. As is oftentimes true, viewing present circumstances through the unforgiving lens of hindsight is unsettling because it is easy to focus on the innumerable and imaginary "what if" scenarios. This case is no exception; any number of events in this case could have gone differently, even however so slightly, which may have avoided the sad and unfortunate death of Andrew Scott. However, as discussed more fully below, the legal analysis is not so simple.

Young v. Borders, No. 5:13-CV-113-OC-22PRL, 2014 WL 11444072, at *2 (M.D. Fla. Sept. 18, 2014).  The district court's legal analysis follows.

### A.    Objective Reasonableness Test

There is no question Deputy Sylvester subjectively perceived an imminent threat of serious bodily harm.  But the proper legal inquiry is an objective one. The district court recognized that the only relevant question is whether a police officer in this same situation could have reasonably and objectively perceived this person with a gun as posing an immediate threat of serious bodily harm.

A Fourth Amendment seizure occurs when a police officer uses excessive force against a person.  Scott v. Harris, 550 U.S. 372, 381, 127 S. Ct. 1769, 1776 (2007).  An officer may use deadly force against only a person whom an officer reasonably perceives as posing an imminent threat of serious physical harm to the

officer or others.  Robinson v. Arrugueta, 415 F.3d 1252, 1256 (11th Cir. 2005); McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1246 (11th Cir. 2003). Reasonableness depends on all the circumstances relevant to an officer's decision to use force and the amount of force used.  McCormick, 333 F.3d at 1246.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene" and the inquiry "is an objective one."  Graham v. Connor, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 1872 (1989).  Thus, the district court properly viewed the circumstances from the perspective of a reasonable officer on the scene at Apartment 114.

Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," its proper application also "requires careful attention to the facts and circumstances of each particular case."  Graham, 490 U.S. at 396, 109 S. Ct. at 1872 (internal quotation marks omitted).  In its order, the district court recited the facts at length and properly "analyz[ed] the totality of the circumstances."  Plumhoff v. Rickard, 572 U.S. ___, ___, 134 S. Ct. 2012, 2020 (2014).

**B.    Objective Reasonableness of Deputy Sylvester's Split-Second Decision**

Based on the total circumstances that led Deputy Sylvester to knock on the 114 door, the district court concluded that a police officer, with Sylvester's knowledge, could have reasonably perceived in that split-second (1) that the person

13

who opened the 114 door with a gun in his hand was the reported armed motorcyclist, (2) that the person's sudden movement—backing and edging behind the door—was an attempt to take cover to fire, and (3) that the person thus posed an imminent "threat of serious physical harm" to Sylvester.  See Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013) (quoting McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009)).  This is because a reasonable officer in Sylvester's position, facing the occupant holding a gun, already would have known the following: (1) there were police reports of an armed motorcyclist in the area who recently was involved in a violent incident; (2) Sylvester had just pursued, but lost sight of, a 90 mph speeding motorcycle in the same area; (3) Sylvester and his fellow officers located a similar motorcycle nearby in front of Apartment 114 that was recently driven and still hot; (4) this motorcycle was parked next to a Chevy registered to the same person; (5) the motorcycle's armed driver had presumably gone into a nearby apartment right before the officers arrived; (6) only one of the nearby apartments had lights on, and that was 114, the one directly in front of the still-hot motorcycle and Chevy; and (7) the occupant of Apartment 115 next door answered and said, "He lives over there."

The district court reasoned that it "must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where

14

inaction could prove fatal." Young, 2014 WL 11444072, at *14 (quoting Crosby v. Monroe Cty., 394 F.3d 1328, 1334 (11th Cir. 2004)); see also Jean-Baptiste v. Gutierrez, 627 F.3d 816, 820–21 (11th Cir. 2010).  These types of split-second decisions occur "in circumstances that are tense, uncertain, and rapidly evolving," Graham, 490 U.S. at 397, 109 S. Ct. at 1872.

Importantly, the district court concluded that this was not just Sylvester's subjective belief but an objectively reasonable perception of an officer on the scene.  The district court concluded that Sylvester was not required to wait and see what might happen if he did not stop Mr. Scott, citing Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.").  The district court concluded that Deputy Sylvester's split-second decision to use deadly force was objectively reasonable under the total circumstances—a reasonably perceived imminent threat of serious physical harm—and was not a constitutional violation.

## III.   QUALIFIED IMMUNITY

Although the district court ruled on the constitutional violation issue, our panel did not need to decide it.  This is because the district court also concluded that "[e]ven if . . . Sylvester violated Scott's constitutional rights . . . by using excessive force, Sylvester would be entitled to qualified immunity because he

15

violated no clearly established right." Young , 2014 WL 11444072, at *18. The panel simply and correctly found "no reversible error in the district court's ultimate qualified immunity rulings." At a minimum, no clearly established federal law as of July 15, 2012[3] gave fair and clear notice to Deputy Sylvester that his conduct in these unique circumstances was objectively unreasonable and unlawful, and thus "no reversible error" was shown. We explain why the district court did not err on the clearly established prong.

## A.    Fair Notice Requires Prior Cases with Particularized Facts.

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" White, 580 U.S. at ___, 137 S. Ct. at 551 (quoting Mullenix v. Luna, 577 U.S. ___, ___, 136 S. Ct. 305, 308 (2015) (per curiam)). In the last five years, the Supreme Court has issued a number of opinions reversing federal courts that denied qualified immunity, often because they applied the clearly established analysis at too high a level of generality and without regard to the particular facts of prior case law. See id.; see also City & Cty. of San Francisco v. Sheehan, 575 U.S. ___, ___, 135 S. Ct. 1765, 1774 n.3 (2015) (collecting cases). The Supreme Court "found this necessary both because qualified immunity is

---

[3]When determining whether the unlawfulness of an officer's actions was already clearly established, we look to the state of the law on the date of the challenged conduct. Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002); see also Fish v. Brown, ___ F.3d ___, ___, No. 15-12348, 2016 WL 5746264, at *6 (11th Cir. Oct. 3, 2016).

16

important to 'society as a whole,' and because as 'an immunity from suit,'
qualified immunity 'is effectively lost if a case is erroneously permitted to go to
trial.'" White, 580 U.S. at ___, 137 S. Ct. at 551-52 (quoting Sheehan, 575 U.S. at
___ n.3, 135 S. Ct. at 1774 n.3, and Pearson v. Callahan, 555 U.S. 223, 231, 129 S.
Ct. 808, 815 (2009)).

In White, the Supreme Court reiterated "the longstanding principle that
'clearly established law' should not be defined 'at a high level of generality.'" Id.
at ___, 137 S. Ct. at 552 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S.
Ct. 2074, 2084 (2011)). The Supreme Court explained that federal courts that
relied on Graham, Garner, and their circuit court progeny, instead of identifying a
prior case with similar circumstances, have "misunderstood" the "clearly
established" analysis because those excessive force cases do not create clearly
established law outside of an "obvious case":

> The panel majority misunderstood the "clearly established" analysis:
> It failed to identify a case where an officer acting under similar
> circumstances as Officer White was held to have violated the Fourth
> Amendment. Instead, the majority relied on Graham, Garner, and their
> Court of Appeals progeny, which—as noted above—lay out
> excessive-force principles at only a general level. Of course, "general
> statements of the law are not inherently incapable of giving fair and
> clear warning" to officers, United States v. Lanier, 520 U. S. 259, 271
> (1997), but "in the light of pre-existing law the unlawfulness must be
> apparent," Anderson v. Creighton, supra, at 640. For that reason, we
> have held that Garner and Graham do not by themselves create clearly
> established law outside "an obvious case." Brosseau v. Haugen, 543
> U. S. 194, 199 (2004) (per curiam); see also Plumhoff v. Rickard, 572

17

U. S. ___, ___ (2014) (slip op. at 13) (emphasizing that <u>Garner</u> and <u>Graham</u> "are 'cast at a high level of generality'").

<u>Id.</u>  Like <u>White</u>, "[t]his is not a case where it is obvious that there was a violation of clearly established law under <u>Garner</u> and <u>Graham</u>" because "this case presents a unique set of facts and circumstances," which is "an important indication" that Deputy Sylvester's "conduct did not violate a 'clearly established' right."  <u>Id.</u>  With the help of hindsight, the dissents impermissibly second-guess Sylvester's split-second decision to use deadly force.  The dissents define clearly established federal law at too high a level of generality, in contravention of the Supreme Court's precedent requiring a case with particularized and similar factual circumstances in order to create "clearly established" federal law.[4]

As the Supreme Court explained decades ago, "the clearly established law must be 'particularized' to the facts of the case."  <u>Id.</u> (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).  For that reason, "[a] clearly established right is one that is 'sufficiently clear that <u>every reasonable official</u> would have understood that what he is doing violates that right.'"

---

[4]There is only one exception "to the rule requiring particularized case law to establish clearly the law in excessive force cases."  <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 926 (11th Cir. 2000).  That exception is an "obvious clarity" case where the official's conduct is "so egregious that a constitutional right was clearly violated, even in the total absence of case law."  <u>Maddox v. Stephens</u>, 727 F.3d 1109, 1121 (11th Cir. 2013) (quotation marks omitted).  In such a case, "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw."  <u>Priester</u>, 208 F.3d at 926.  "Our case law has made clear that 'obvious clarity' cases will be rare," and the plaintiffs on appeal did not argue this was an "obvious clarity" case.  <u>Coffin v. Brandau</u>, 642 F.3d 999, 1015 (11th Cir. 2011) (en banc).

Mullenix, 57 U.S. at ___, 136 S. Ct. at 308 (emphasis added) (quoting Reichle v. Howards, 566 U.S. ___, ___, 132 S. Ct. 2088, 2093 (2012)); see also Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012).

The Supreme Court has also explained: "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix, 57 U.S. at ___, 136 S. Ct. at 308 (quotation marks omitted). Although identical facts are not required, there still must be particularized facts that made clear to Deputy Sylvester that his force action was unlawful. "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" Sheehan, 575 U.S. at ___, 135 S. Ct. at 1774 (quoting Ashcroft, 563 U.S. at 743, 131 S. Ct. at 2085).

Again, qualified immunity may be denied only when the officers have "fair and clear warning of what the Constitution requires." Sheehan, 575 U.S. at ___, 135 S. Ct. at 1778. Even before White, this Court recognized that this "critical inquiry" about "fair warning" "must be undertaken in light of the specific context of the case, not as a broad general proposition." Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) (quotation marks omitted). "Such specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive

19

force, will apply to the factual situation the officer confronts." Mullenix, 57 U.S. at ___, 136 S. Ct. at 308 (alteration accepted) (quotation marks omitted).

## B.    No Clearly Established Federal Law Gave Fair Notice.

Here, the panel was required to find "no reversible error" because there is no prior case with facts remotely similar, much less particularized facts similar, to the facts in this case. More importantly, even the contours of the law in this type of unusual factual situation were not sufficiently clear such that a reasonable officer, in Defendant Sylvester's situation, would understand that what he is doing violates clearly established federal law.[5]

In its clearly established analysis, the dissent relies on our decisions in Lundgren v. McDaniel, 814 F.2d 600, 602 (11th Cir. 1987) and Menuel v. City of Atlanta, 25 F.3d 990 (11th Cir. 1994). The dissent claims that these two cases establish a "straightforward line" that police cannot shoot people merely because they have a gun in their own home. Martin, J. dissenting at 15. Of course, that ignores the critical events that led Deputy Sylvester to the door of Apartment 114 and what happened when the door opened. The dissent also says that Lundgren and Menuel involved "circumstances closely resembling this case." Id. at 12. This is inaccurate because those cases have materially different facts.

---

[5]As to qualified immunity, the defendant has the burden to show he was acting within his discretionary authority. It is undisputed that Deputy Sylvester acted within his discretionary authority. Therefore, the burden shifted to the plaintiffs to demonstrate that Sylvester violated the plaintiffs' clearly established constitutional rights. Carter v. Butts Cty., 821 F.3d 1310, 1319 (11th Cir. 2016).

In <u>Lundgren</u>, law enforcement officers walked by a store and saw a broken window.  Suspecting a burglary, they entered the store without announcing themselves.  814 F.2d at 602.  In <u>Lundgren</u>, unlike this case, there was no advance report that a burglary suspect in the store might have a gun, much less an advance report of a speeding motorcyclist involved in an assault and battery with a loaded firearm.  <u>Id.</u>  Upon entry, the officers in <u>Lundgren</u> instantaneously shot the storeowner who, after hearing the officers in his store, rose up from behind his desk where he had been sleeping.  <u>Id.</u>

In <u>Lundgren</u>, there was even conflicting testimony about whether the storeowner had a gun.  The officers testified that they saw a man with a pistol in his hands.  The storeowner's wife, who was with him, gave conflicting testimony about whether or not the storeowner had reached for his gun but said that the storeowner "never really had a chance to get up off the floor."  <u>Id.</u>  Indeed, the forensic evidence showed that the bullet that struck the storeowner in the head had first passed through the desk.  <u>Id.</u>

This Court reviewed that conflicting evidence from the <u>Lundgren</u> trial and concluded that, based on the evidence, the "jury could have reasonably believed that the officers were neither threatened by a weapon, nor appeared to be threatened by a weapon, nor were fired upon, but rather that the officers without provocation shot at a nondangerous suspect."  <u>Id.</u> at 603.  We thus held that

21

shooting a non-threatening suspect was an unreasonable seizure that was clearly established, and we denied qualified immunity. Id.

No jury is needed here to decide if a storeowner reached for a gun or not. It is undisputed Mr. Scott held a gun when he opened the door and was in full view of Deputy Sylvester. The officers here knocked on the door first and did not enter into a store unannounced. The officers also had reason to think that the motorcyclist may be inside Apartment 114 and may be armed and dangerous. This reasonable suspicion was seemingly verified when Mr. Scott opened the door with a gun in his hand and began moving in a manner reasonably perceived as an attempt to take cover to fire. If anything, Lundgren is inapposite here.

The dissent's second case is Menuel, where officers shot a girl after she fired at them.[6] 25 F.3d at 993. Given that the girl shot first, this Court concluded that the officers' actions were objectively reasonable and that no Fourth Amendment violation occurred. Id. at 997. While the Menuel officers took fire before shooting, nothing in Menuel states, much less holds, that officers must wait to be fired upon before using deadly force. Menuel provides little guidance on whether an officer may reasonably believe the use of deadly force is justified when the

---

[6] In Menuel, the girl's family called 911, reporting that the girl was behaving violently and erratically. 25 F.3d at 991. The girl locked herself in the bedroom after attacking several officers with a butcher knife. Id. at 992. When the officers later entered the bedroom the girl shot at them with a handgun, which generated a muzzle flash. Id. The officers then fired eight shots, which killed her. Id.

person reportedly has been in a prior armed altercation, has a gun, and moves as if to take cover to fire.

Taken together, what these two prior cases (cited by the dissent) do illustrate is the wide variety of difficult and complex facts in excessive force cases. These two cases, however, do not closely, or even similarly, resemble the facts of this case, which means qualified immunity protects Deputy Sylvester. See Mullenix, 57 U.S. at ___, 136 S. Ct. at 312 ("Even accepting that these circumstances fall somewhere between the two sets of cases . . . qualified immunity protects actions in the 'hazy border between excessive and acceptable force.'") (quoting Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004)). Nor do these two cases put Sylvester on "fair notice" that the use of deadly force in this factual situation violated the Fourth Amendment. This is a difficult and unique case that is not answered by either our precedent or Supreme Court precedent. To find Sylvester's use of force objectively unreasonable, that conclusion must "follow immediately" from the principles of our past precedents. Mullenix, 57 U.S. at ___, 136 S. Ct. at 309. That is not the case here.

The panel's unpublished, non-precedential affirmance of the district court's qualified immunity ruling is not incongruous with this Circuit's precedent in excessive force cases. En banc consideration is thus not necessary to "maintain

uniformity of the court's decisions" under Federal Rule of Appellate Procedure 35. Fed. R. App. P. 35(a)(1).

## IV.   "SEARCH" THEORY OF FOURTH AMENDMENT LIABILITY

Even if qualified immunity attaches to the excessive force claim, the dissent alternatively argues that the plaintiffs' "search" claim should go to trial.  That search claim alleges that Deputy Sylvester's conduct before Mr. Scott opened the door amounted to a "warrantless raid and search" of Mr. Scott's home that violated the Fourth Amendment.

Recognizing the "sanctity of the home" from government intrusion, the district court determined that Deputy Sylvester's approach to the door and knocking were lawful under the knock and talk rule.  Under Supreme Court precedent, the knock and talk rule permits the police to enter onto private land and knock on a citizen's door for legitimate police purposes, such as gathering information in an investigation.  See Florida v. Jardines, 569 U.S. ___, 133 S. Ct. 1409 (2013).  We need not decide whether Deputy Sylvester's conduct before the door opened violated the Constitution because no clearly established federal law gave Sylvester fair and clear notice that his conduct constituted an illegal search.

### A.    Warrantless Entry into the Curtilage of a Home

In this case, Deputy Sylvester stood on the ground immediately surrounding the stoop to Apartment 114 as he knocked on the front door.  Under a Fourth

24

Amendment analysis, Sylvester entered the curtilage of Mr. Scott's home without a warrant, and his conduct at the door took place in a constitutionally protected area. Jardines, 569 U.S. at ___, 133 S. Ct. at 1415 (instructing that the area "surrounding and associated with the home"—the curtilage—is "part of the home itself for Fourth Amendment purposes" and that a "front porch is the classic exemplar of an area . . . to which the activity of home life extends"). The question becomes whether his conduct fell within the knock and talk exception to a warrantless search. We outline that exception and how the district court applied it.

## B.    Knock and Talk Exception

In Florida v. Jardines, the Supreme Court reaffirmed the knock and talk exception, stating that a police officer "not armed with a warrant" still enjoys an implied license to knock on an individual's door in order to gather information related to the officer's investigation. Id. at ___, 133 S. Ct. at 1416; see also Kentucky v. King, 563 U.S. 452, 469, 131 S. Ct. 1849, 1862 (2011) (stating that a police officer "not armed with a warrant" may approach a home and knock). "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Jardines, 569 at ___, 133 S. Ct. at 1415. "The mere purpose of discovering information in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment." Id. at ___ n.4, 133 S. Ct. at

25

1416 n.4 (quotation marks and citations omitted). Thus, "it is not a Fourth Amendment search to approach the home in order to speak with the occupant." Id.

The scope of this knock and talk exception is limited in two respects. United States v. Walker, 799 F.3d 1361, 1363 (11th Cir. 2015), cert. denied, 136 S. Ct. 857 (2016). First, "the exception is geographically limited to the front door or a 'minor departure' from it." Id. Second, the exception does not apply where the objective purpose of the officer's behavior is "to do nothing but conduct a search." Jardines, 569 U.S. at ___ n.4, 133 S. Ct. at 1416 n.4.

In Jardines, the police officer did not approach and knock on any door. Id. at ___, 133 S. Ct. at 1413. Rather, based on a tip about marijuana growing inside the home, the officer went to the home to obtain evidence. To do that, the officer brought a drug-sniffing dog to the defendant's home and had it sniff around the front porch and the base of the front door, where the dog indicated a positive alert for narcotics. Id.

The Jardines officer applied for and received a search warrant based on the evidence of the dog's positive alert. Id. The problem with the officer's conduct was that taking a trained drug-sniffing police dog to explore the porch and area around the home to obtain the incriminating evidence "objectively reveal[ed] a purpose to conduct a search" of the porch. Id. at ___, 133 S. Ct. at 1417. The

26

officers did "nothing but conduct a search" and thus violated the Fourth Amendment.  Id. at ___, ___ n.4, 133 S. Ct. at 1416-18, 1416 n.4.

## C.    Approaching and Knocking on 114's Door

In stark contrast to Jardines, the officers here did not snoop around the house, peer into the windows, or take any other steps to collect evidence.  Instead, Deputy Sylvester approached the plaintiffs' apartment, stayed at the front door, and knocked.  Sylvester did not stand on the steps or the stoop, but rather stood on the ground to the left of the door.  He knocked to seek information about and locate the owner, albeit possibly armed, of the still-hot motorcycle parked out front by talking to the residents of Apartment 114.  The district court considered all of the conduct at the door, reasoning as follows:

> Although the officers in this case positioned themselves in front of the only exit to Apartment 114 with their guns drawn, the LCSO officers did not order Scott or Mauck out of their apartment. As discussed previously, there is no evidence to show that Scott or Mauck even knew that the officers had their guns drawn. Further, there is no evidence presented . . . to show that the officers would not have permitted Scott or Mauck to stay in Apartment 114; to the contrary, the unrebutted testimony in this case is that the officers would have been required to leave if nobody answered the door. The only activity outside of the apartment that Scott and Mauck knew of was that someone had knocked on their door loudly. As discussed above, this is not such a "show of authority" that would permit Scott and Mauck to believe they would not have been permitted to stay inside their apartment.

Young, 2014 WL 11444072, at *11.  The district court thus determined that

Sylvester's conduct before the door opened fell squarely within the knock and talk

exception and did not violate the Fourth Amendment.[7]

## D.    No Clearly Established Federal Law

Once again, we need not decide the constitutional violation issue.  At a

minimum, no clearly established federal law on July 15, 2012 gave fair and clear

notice to Sylvester that his conduct before the door opened was an illegal search.

"Our Court looks only to binding precedent—cases from the United States

Supreme Court, the Eleventh Circuit, and the highest court of the state under which

the claim arose—to determine whether the right in question was clearly established

at the time of the violation."  Coffin, 642 F.3d at 1013.  In doing so we also only

look at the state of the law on the date of the challenged conduct.  Hope, 536 U.S.

at 741, 122 S. Ct. at 2516.  "Qualified immunity shields an officer from suit when

she makes a decision that, even if constitutionally deficient, reasonably

misapprehends the law governing the circumstances she confronted."  Brosseau,

543 U.S. at 198, 125 S. Ct. at 599.  The dissent does not cite any Supreme Court,

binding Eleventh Circuit, or Florida Supreme Court case that would have put

---

[7]To be clear, the events that occurred after the door opened are properly analyzed under the excessive force category of Fourth Amendment seizure claims, and the plaintiffs presented a claim under that theory, albeit one that ultimately fails due to qualified immunity.  The officers' actions prior to the door opening are analyzed under the scope of a permissible knock and talk.

28

Deputy Sylvester on fair and clear notice that the time and manner of his approach on July 15, 2015 was illegal.

Instead, relying on cases from other circuits, the dissent argues that it is clearly established federal law that Deputy Sylvester's behavior was "a raid" and exceeded the scope of the permissible knock and talk exception because it was 1:30 a.m., he unholstered his weapon, and he knocked so loudly. In those cases, however, the officers made warrantless entries using a coercive show of force. In contrast, the officers' actions here are dissimilar and do not rise to the level of a "show of force" found impermissible in those other cases.

For example, in United States v. Gomez-Moreno, the officers attempted a "knock and talk" at a suspected stash house for illegal aliens. 479 F.3d 350, 352-53 (5th Cir. 2007).[8] Ten to twelve armed officers drove to the residence, formed two groups (one for each of the two houses at the location), surrounded both houses, and had a helicopter hovering overhead. Id. at 352, 355. At the front house, no one answered, so the officers checked the doorknob to see if it would open. Simultaneously at the back house, officers announced their presence and demanded that the occupants open the door. Id. The Fifth Circuit concluded that

---

[8]The Fifth Circuit has acknowledged that Gomez-Moreno was overruled in some respects by Kentucky v. King, 563 U.S. 452, 131 S. Ct. 1849 (2011). United States v. Montgomery, 777 F.3d 269, 273 (5th Cir. 2015).

29

the knock and talk strategy was unreasonable because "the officers made a show of force, demanded entrance, and raided the residence." Id. at 356.

In contrast, Deputy Sylvester did not even check the door knob, did not demand the door be opened, and did not have a helicopter hovering overhead. In addition, the lateness of the knock on Mr. Scott's door did not make Sylvester's actions "a raid" because the lights were on in the apartment. See Walker, 799 F.3d at 1364 (finding that, at five in the morning before sunrise, the officers were not unreasonable in approaching a car parked in the carport because the lights in the house and in the car were both on). The dissent does not dispute the lights were on and even points out that the occupants were still up and playing video games.

Rather, the dissent claims that Mr. Scott was obligated to open the door because "the officer kept slamming on it." Martin, J. dissenting at 21. A handful of knocks, without any verbal demand, does not create a non-consensual "obligation" to answer the door, and the undisputed facts here indicate that Sylvester had his gun behind his leg when he knocked on the door. Sylvester's gun was not pointed at the door or the house before the door opened.

In any event, cases from other circuits do not create clearly established federal law for this circuit. Coffin, 642 F.3d at 1013.

## V.    CONCLUSION

In conducting its qualified immunity analysis, the district court's decision viewed the facts in the light most favorable to the plaintiffs.  When there were disputes in the record, it accepted the plaintiffs' version of these tragic facts as true.  The district court thoroughly and diligently reviewed the facts and legal issues in this case.  At a minimum, the district court committed "no reversible error" because no clearly established federal law gave clear and fair notice that Deputy Sylvester's conduct was unlawful.  The panel's affirmance is not en banc worthy under Federal Rule of Appellate Procedure 35.

Finally, it is important to stress that orders denying rehearing en banc, even this published one, have no binding or precedential value.  We have explained why before, stating:

> "[W]hile [we] would like to think that [our] judicial colleagues chose not to vote this case en banc because they opined that the panel reached a correct result for the right reasons, [we are] well aware that some [voting against rehearing en banc] may have disagreed with the panel but knew that the opinion would be non-precedential.  A denial of en banc rehearing is similar to a denial of certiorari by the Supreme Court; it communicates little, if anything, about the position of the court or the issues presented.  Indeed, although [the panel members] have outlined the reasoning underlying our . . . views of the court's denial of en banc rehearing in this particular case, our opinions in this regard, like [the dissent's and] the court's decision to deny rehearing, have no binding or precedential value."

<u>Riley v. Camp</u>, 130 F.3d 958, 983 n.7 (11th Cir. 1997) (Birch, J., concurring in the denial of rehearing en banc). Accordingly, nothing in this order is binding or has precedential value.[9]

---

[9]One dissent laments that our panel decision may encourage other law enforcement officers in similar conduct, but, respectfully, our summary, non-published panel opinion here does not do that.

MARTIN, Circuit Judge, with whom WILSON, ROSENBAUM and JILL PRYOR, Circuit Judges, join, dissenting from the denial of rehearing en banc:

This case arises out of the fatal police shooting of an innocent young man. Andrew Scott and his girlfriend were in their home playing video games late one night when police arrived outside. The police had no warrant and no reason to suspect Mr. Scott or his girlfriend had committed any crime. The officers acknowledge both of these things to be true. Even so, the police tactically surrounded the home's only exit, drew their guns, repeatedly slammed on the door without identifying themselves as law enforcement, and then shot and killed Mr. Scott when he opened the door, as he was stepping back into his home. The District Court rejected the 42 U.S.C. § 1983 claims brought by Mr. Scott's bereaved parents and girlfriend, holding that the police acted reasonably. A panel of this Court affirmed in a three-sentence, unpublished opinion, and now a majority of this Court's judges have voted not to rehear the case en banc. I dissent from that decision.

There are problems with the holdings that the panel summarily affirmed. I will turn my attention to two. First, under no standard was it reasonable for the police to kill Mr. Scott when he answered the knock at the door to his home. He was not suspected of any crime (much less a violent crime) and he was standing inside his own house without threatening them. Second, the police were not engaged in a permissible "knock and talk" when they killed Mr. Scott. Their

33

aggressive tactics crossed far over the line from a consensual visit into a warrantless raid. When it upheld these rulings by the District Court, the panel (and now a majority of this Court) gave a pass to dangerous, unconstitutional police actions in a way that makes it more likely that tragic police shootings will continue to occur.

I.

While two members of the panel have now written extensively about why Mr. Scott's survivors should be barred from presenting their case to a jury, the panel opinion set forth no facts about this case. Now that we are reviewing the record, it reveals hotly disputed facts that are central to deciding whether qualified immunity protects these officers from facing a jury in a civil trial. See Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013). Viewed in the light most favorable to the plaintiffs, see Perez v. Suszczynski, 809 F.3d 1213, 1217 (11th Cir. 2016), the material facts are as follows:[1]

Deputy Richard Sylvester, of the Lake County Sheriff's Office in Florida, saw a motorcycle speeding down a street one night and started after it in his patrol car. Because the motorcycle had a head start, Deputy Sylvester quickly realized

---

[1] Although the concurrence to the denial of rehearing en banc says that Judge Jill Pryor and I have "omit[ted] key, undisputed facts," Conc. Op. at 2, Judge Hull's account of the facts almost exactly echoes my account. The fact that we draw such divergent conclusions from our similar understanding of the facts highlights the need to have a jury decide this case. The concurrence does point to a few additional bits of information, some of which it labels as "undisputed facts." I don't view them as undisputed, but even accepting the concurrence's facts, this case cries out for a jury.

that his car was never going to catch up, and he abandoned pursuit when the motorcycle pulled out of sight. Deputy Sylvester never identified the speeding motorcycle, or even saw what color it was.

After the failed chase, the police dispatcher speculated with Deputy Sylvester that the speeding motorcycle "might possibly" have been the same one used by an armed assault and battery suspect in a different area, about five miles away. This possible connection between the two motorcycles was not then investigated. The officers just assumed they were one and the same. Later, another officer radioed Deputy Sylvester and speculated that he had found "the" motorcycle at Blueberry Hill Apartments.[2] The officer noted that the motorcycle at Blueberry Hill Apartments was hot on this July night, which he took to mean that it had been driven recently.

Deputy Sylvester then drove to Blueberry Hill Apartments. After arriving, he saw a motorcycle parked in the apartment complex's shared parking lot.[3]

-----

[2] From a reasonable officer's perspective at this point, there were as many as three different motorcycles in play: (1) the speeding motorcycle that Deputy Sylvester never identified during his failed pursuit; (2) the motorcycle used by an assault and battery suspect in another area and reported secondhand from the Leesburg Police Department; and (3) the motorcycle at Blueberry Hill Apartments. The concurrence suggests that the officers reasonably assumed they were all the same. Given that there were 12,143 motorcycles registered just in Lake County, Florida, at the time Mr. Scott was killed, this assumption was questionable. See Florida Highway and Motor Vehicles Registration Statistics, July 1, 2012, http://flhsmv.gov/html/reports_and_statistics/CVR/12-13/CVR-07-2012.pdf.

[3] The concurrence cites as an undisputed fact that Deputy Sylvester "positively identif[ied]" the motorcycle at Blueberry Hill Apartments as the speeding motorcycle from his failed pursuit. Conc. Op. at 5. However, this conflicts with Deputy Sylvester's sworn testimony

35

Deputy Sylvester ran a tag search on the motorcycle and found that it was registered to an address in a different city, as was a car parked next to it.  The tag search revealed no incriminating information.  The time was around 1:30 a.m., and there were four officers on the scene.

The officers decided to "knock on doors at the complex and try to gather information."  They chose to start with Apartment 114 because a light was on inside and it was located near where the motorcycle was parked in the shared lot.[4]  The officers had no warrant, no idea which apartment the motorcyclist might be in (if any),[5] and no reason to suspect the occupants of Apartment 114 of any crime.

_____

that he never saw the speeding motorcycle's make, model, or color.  Where there are conflicting accounts, we construe the facts in the light most favorable to the non-movant (here, the plaintiffs).  Perez, 809 F.3d at 1217.  We must therefore reject Deputy Sylvester's claim of positive identification.

[4] At least one of the officers knew that the parking spots at Blueberry Hill Apartments were not assigned, but were instead shared throughout the whole complex.  Anyone could park anywhere.

The concurrence says "Deputy Sylvester observed a fresh footprint in the sand next to the motorcycle leading toward [Apartment] 114."  Conc. Op. at 6.  Once again, this is not an undisputed fact.  None of the other three officers on the scene backed up his story of a "fresh footprint."  When Corporal McDaniel was specifically asked if he saw anything that connected the motorcycle with Apartment 114, he said he usually pays attention to tracking clues like "an obvious footprint," but reported none here.  Curiously, Judge Hull acknowledges that "[o]ther officers do not recall seeing a footprint" but lists the purported footprint in her section of "undisputed" facts anyway.  Conc. Op. at 6.  We are not permitted to construe this equivocal and unsupported testimony against Mr. Scott.  Even if we could, a footprint would suggest only that someone, at some time, walked from the shared parking lot toward the building shared by Apartment 114.  What to infer from that is something a jury should decide.

[5] The concurrence includes one of several photographs from the record on summary judgment for the apparent purpose of supporting the connection the officers made between the motorcycle and Mr. Young's apartment.  Conc. Op. at 6.  But this is fact finding.  The extent to which any photograph may or may not support the police officers' reasons for approaching Mr.

36

Indeed, they later acknowledged that "the occupants of Apartment [114] were not suspects." Meanwhile, inside Apartment 114, Mr. Scott and his girlfriend, Miranda Mauck, were playing video games in their pajamas. Neither of them owned a motorcycle. They were just living their lives in the privacy of their home.

The four police officers assumed "tactical positions" surrounding the only door to Apartment 114. Their guns were all drawn and ready to shoot. Deputy Sylvester stood to the left of the door, up against the exterior wall, while a second officer stood in a mirrored position to the right. The two other officers stood behind a nearby privacy fence. None of the officers stood on the raised concrete slab in front of the door, where a visitor would stand. None of the patrol cars displayed emergency lights, and the area around Apartment 114 was dark enough that two of the officers used flashlights.

Deputy Sylvester, holding his drawn gun by his leg, pounded repeatedly on the door of Apartment 114 with his other hand. Neighbors hundreds of feet away described the knocks as "very loud," as did Ms. Mauck.[6] One officer testified that the knocks sounded loud because the door was hollow. The officers never

---

Scott's home should be resolved by a jury. And in any event, wherever this motorcycle was parked, it hardly justified the killing of Mr. Scott.

[6] Deputy Sylvester says that he knocked "in a normal manner" because he was concerned about waking children inside. However, Ms. Mauck, neighbors, and a fellow officer stated that the knocks were loud, so we must once again discredit a contradicted claim of Deputy Sylvester. His statement also leads one to wonder why Deputy Sylvester readied himself for a shootout if he thought children were inside.

identified themselves as law enforcement. Drawn outside by this late-night commotion, a neighbor told the officers that the motorcycle's owner "lives over there," gesturing toward a different building. Deputy Sylvester heard this but apparently did not see the gesture.

Inside Apartment 114, Mr. Scott and Ms. Mauck were startled by this anonymous pounding on their door at 1:30 a.m. They went to their bedroom to change out of their pajamas, and when the pounding continued, Mr. Scott retrieved a handgun. There were no sirens or emergency lights to alert him to a police presence,[7] and there is no evidence that Mr. Scott knew police were surrounding his door in the middle of the night.

What happened next took place within about two seconds. Mr. Scott began opening his door inward at medium speed while holding his gun pointed safely down at the ground.[8] At no point did Mr. Scott raise his gun or step outside of his home. To the contrary, as soon as Mr. Scott saw Deputy Sylvester—a shadowy figure hiding outside his door, clutching a pistol—Mr. Scott began retreating inside

---

[7] The concurrence says the officers parked their patrol vehicles "in plain view outside Apartment 114" and that "[t]here was a front window next to the front door of 114." Conc. Op. at 7. This suggests that Mr. Scott was aware of police presence. Once again, the record we have is more complicated than this. In her deposition, Ms. Mauck said she believed there was a fan in the living room window the night of the shooting. A fan could have obstructed Mr. Scott's view of the police cars, so construing the evidence in the light most favorable to plaintiffs, we must assume here that police cars were not visible from that window.

[8] Deputy Sylvester claimed that Mr. Scott "flung open" the door and "was standing there with his arm extended and a semi-automatic pistol pointed straight at my face." Yet again, Deputy Sylvester's claim conflicts with other record evidence, so we cannot rely on it.

38

and closing his door.  This seems like a normal enough response, but Deputy

Sylvester says he viewed Mr. Scott's retreat as an attempt to "get a position of

cover [behind the door] where he can engage me."[9]  Deputy Sylvester started

shooting without warning.  He rapidly fired six bullets.  Three hit Mr. Scott.  Mr.

Scott collapsed onto his couch, where he died from his injuries.  Mr. Scott never

fired a shot.  In fact, he never even chambered a round so his gun could fire.

## II.

Qualified immunity protects officers only when they do not violate the

victim's clearly established rights.  Perez, 809 F.3d at 1218.  Courts are tasked

with a two-part inquiry when deciding whether qualified immunity applies: (1) do

the facts alleged, construed in the light most favorable to the plaintiffs, establish

that a constitutional violation occurred; and (2) was the violated constitutional right

clearly established.  Id.  A right may be clearly established by an existing decision

of the Supreme Court, this Court, or the state high court.  Valderrama v. Rousseau,

780 F.3d 1108, 1112 (11th Cir. 2015).  For a right to be clearly established, "there

need not be a case on all fours, with materially identical facts"; indeed, there can

be "notable factual distinctions" between the precedent and the case before the

court.  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1278 (11th Cir.

2004) (quotations omitted).  Although the Supreme Court recently reminded us

---

[9] As mentioned, one of the officers testified that the door was hollow, a quality that Deputy Sylvester may have observed while knocking.

that "clearly established law should not be defined at a high level of generality," it also restated the exception to this rule: "general statements of the law" can still create clearly established law in "obvious case[s]." White v. Pauly, 580 U.S. ___ (2017) (slip op. at 6–7). We have said that officials need only have "reasonable warning" that their conduct violated constitutional rights. Holloman, 370 F.3d at 1278 (quotation omitted); see also United States v. Lanier, 520 U.S. 259, 271 (1997) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning . . . .").

In considering whether the facts alleged show a violation of clearly established law, we must remember to "view all evidence and factual inferences in the light most favorable to the non-moving party." Perez, 809 F.3d at 1217. That means where there are "varying accounts of what happened," the proper standard requires adoption of the account most favorable to the non-movants. Id.; see also Feliciano v. City of Miami Beach, 707 F.3d 1244, 1252 (11th Cir. 2013).

## III.

Contrary to what the District Court found, there were two clear constitutional violations here. First, the reflex shooting and killing of Mr. Scott, as he opened the door to his house then tried to step back inside, was manifestly unreasonable under these circumstances. Second, the aggressive police tactics that

40

led to this tragedy far exceeded the scope of a consensual, information-gathering "knock and talk." By accepting these violations as business as usual, the panel opinion weakens core constitutional rights and gives dangerous guidance to police officers.

A.    Excessive Force

The use of deadly force is a per se seizure under the Fourth Amendment. That being the case, the courts are left to decide only whether the force was reasonable in the circumstances. See Tennessee v. Garner, 471 U.S. 1, 7–8, 105 S. Ct. 1694, 1699 (1985). "To determine the constitutionality of a seizure we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Id. at 8, 105 S. Ct. at 1699 (quotation omitted) (alteration adopted). In considering the government's interests, this balancing test looks at "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989). Ultimately, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene," and the inquiry "is an objective one." Id. at 396–97, 109 S. Ct. at 1872.

Viewing the facts most favorably to these plaintiffs, Deputy Sylvester rapidly fired six bullets at Mr. Scott: (1) who was admittedly not a suspect, (2) who was committing no crime, (3) who was in his own home, (4) with no warning, (5) almost as soon as he opened his door, and (6) as he was stepping back into his home.  Or, to use the Graham balancing test, Mr. Scott was not engaging in any crime (much less a severe one), was not actively resisting arrest, and was not attempting to flee, though Deputy Sylvester thought Mr. Scott posed a threat.  On the other side of the scale, Deputy Sylvester effected the greatest deprivation there is—he killed Mr. Scott.  The District Court held that this killing was objectively reasonable because Deputy Sylvester thought Mr. Scott was a threat when he "saw a man holding a gun."  The court relied almost exclusively on the fact that Mr. Scott had a gun, calling it "the most critical fact in this case."  The court even placed blame on the victim: "Andrew Scott made a fateful decision that night: he chose to answer his door with a gun in his hand.  That changed everything.  That is the one thing that—more than anything else—led to this tragedy."

The District Court's conclusion that the use of deadly force was reasonable in these circumstances is wrong for several reasons.  First, the District Court's conclusion of objective reasonableness on the part of the officers is wrong as a matter of clearly established Fourth Amendment law.  The fact that a person has a gun does not, by itself, decide the excessive-force question.  This Court recently

42

confirmed that "the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit." Perez, 809 F.3d at 1220. While the presence of a weapon may certainly be a part of the excessive-force analysis, "the ultimate determination depends on the risk presented, evaluating the totality of the circumstances surrounding the weapon." Id.

In circumstances closely resembling this case, this Court held that an officer's use of deadly force was excessive even though the victim had a gun. In Lundgren v. McDaniel, 814 F.2d 600 (11th Cir. 1987), a husband and wife who owned a video store slept behind a desk in the store one night because a store window had been broken during the day. Id. at 602. Mr. Lundgren had a handgun with him. Id. Around 2:00 a.m., two deputy sheriffs noticed the broken window and entered the dark store without announcing themselves. Id. When Mr. Lundgren heard glass crunching and began to rise from behind the desk with his gun, one of the deputies shot him to death. Id. Mr. Lundgren never fired his gun. Id. Just like Mr. Scott, Mr. Lundgren was (1) not a suspect, (2) committing no crime, (3) on his own property, (4) killed without warning, and (5) shot immediately after he presented himself with a gun. This Court rejected the argument that the officers acted reasonably by shooting Mr. Lundgren, noting that it would be different if Mr. Lundgren had threatened the officers with his gun. See

43

id. at 602–03.  Thus, the fact that Mr. Lundgren responded to the police's late-night disturbance with a gun did not justify his instant death.

Despite <u>Lundgren</u>'s similarity to this case, neither the District Court nor the panel ever mentioned it.  Now the concurrence says <u>Lundgren</u> is different from Mr. Scott's case because here there was an "advance report of a speeding motorcyclist involved in an assault and battery with a loaded firearm," while in <u>Lundgren</u> there was no advance report of a potentially armed burglary suspect in the store.  Conc. Op. at 19.  This leads to the concurrence's theory (never expressed in the panel opinion) that Deputy Sylvester "had reason to think" that the premises contained someone who was "armed and dangerous" based on the advance report, while the officers in <u>Lundgren</u> had no such reason.  <u>Id.</u> at 20.  Although a valiant effort, this distinction is immaterial.  A broken storefront window indicates trouble and possible danger in the same way an advance report would.  Indeed, a broken window foreshadows danger at a specific location, unlike this case, where Mr. Scott's home came to the officers' attention by way of the fickle finger of fate I've described.  The officers who came to Mr. Scott's home had no good reason to identify the person in Apartment 114 as the armed motorcyclist.  They even acknowledged later that "the occupants of Apartment [114] were not suspects."

The concurrence also says <u>Lundgren</u> is not like Mr. Scott's case because whether the storeowner in <u>Lundgren</u> even had a gun was disputed.  <u>Id.</u> at 19.  But

in its analysis, <u>Lundgren</u> emphasized that the parties there "sharply contested" whether the storeowner "threatened the officers with a weapon," so a jury "could have reasonably believed that the officers were neither threatened by a weapon, nor appeared to be threatened by a weapon." 814 F.2d at 603. This idea is present in Mr. Scott's case as well. Although the parties do not dispute that Mr. Scott held a gun, they do dispute whether Mr. Scott threatened or appeared to threaten Deputy Sylvester with the gun.[10]

There is also related Eleventh Circuit precedent, <u>Menuel v. City of Atlanta</u>, 25 F.3d 990 (11th Cir. 1994), in which this Court rejected an excessive-force claim where the suspect actually shot at police, but noted that the police did not act aggressively toward another member of the same household who held a gun in his own home. Police responded to a call around midnight about a "violent and demented" suspect. Id. at 991. When the police arrived, the suspect opened the door and lunged at them with a butcher knife, then locked herself in a bedroom. Id. at 992. The police entered the bedroom intending to capture her, but she unexpectedly began firing a gun at them. <u>Id.</u> at 993. The police returned fire and killed the suspect. <u>Id.</u> On these facts, this Court held that the officers' use of force was objectively reasonable, noting that the officers "proceeded slowly, cautiously,

---

[10] The concurrence also says that unlike in <u>Lundgren</u>, the officers here "knocked on the door first and did not enter . . . unannounced." Conc. Op. at 20. That's factually incorrect. Although Deputy Sylvester did knock on the door, the officers never identified themselves as law enforcement. Knocking and announcing are two different things.

and precisely, resorting to deadly force only when assaulted with deadly force." Id. at 996. We also noted that the officers "took no unusual or aggressive action" toward the suspect's father when he came out of his bedroom "understandably startled" at the late-night disturbance, even though the father had a loaded shotgun. Id. at 996 n.9.

On its own, Lundgren shows that Deputy Sylvester violated Mr. Scott's clearly established constitutional rights. And when viewed together, Lundgren and Menuel demonstrate the straightforward line courts observe, with people holding a gun in their own house as a constitutionally guaranteed tool of self-defense on one side,[11] and people who go beyond that to menace police with their gun on the other. The Supreme Court also drew this line in Garner, one of the seminal excessive-force cases. See 471 U.S. at 11, 105 S. Ct. at 1701 (prohibiting deadly force where "the suspect poses no immediate threat to the officer [or] to others," but allowing it where "the suspect threatens the officer with a weapon"). On the facts as we must view them here, Mr. Scott was on the right side of this line because he did not threaten the officers with his gun. He merely held it pointing safely at the ground while he was in his own home, and he had even started to retreat. Deputy Sylvester immediately reacted by rapidly firing six bullets at Mr.

---

[11] See District of Columbia v. Heller, 554 U.S. 570, 628, 128 S. Ct. 2783, 2817 (2008) (stating that the home is "where the need for defense of self, family, and property [with a gun] is most acute").

Scott, killing him practically the moment he opened the door.  Under our caselaw, this was not even close to reasonable.[12]

To reach the opposite conclusion, the District Court relied on the fact that Mr. Scott was backing inside his home when he was killed.  That court relied on Deputy Sylvester's subjective belief that Mr. Scott was backing inside to take cover for a gun battle, and the concurrence parrots this point of view.  Conc. Op. at 11–13.  I find it surprising that the concurrence accepts the officers' killing of Mr. Scott based on his retreat into his home.  Yet both the District Court and the concurrence endorse the view that Deputy Sylvester's decision to shoot Mr. Scott dead was objectively reasonable because an officer in Deputy Sylvester's place "could have reasonably perceived" that Mr. Scott's retreat "was an attempt to take cover to fire."  Id. at 11.

This faulty conclusion illustrates the mistake the District Court made (and the concurrence now endorses) in its qualified immunity analysis.  The only fact available to us in reviewing this case is that Mr. Scott stepped back after opening the door.  Deputy Sylvester's perception that Mr. Scott retreated in order to take cover and fire at him is nothing more than the officer's subjective belief.  The law of qualified immunity forbids us from deciding this case based on Deputy

---

[12] For a recent case confirming this proposition, see Ayers v. Harrison, 650 F. App'x 709, 715, (11th Cir. 2016) (per curiam) ("Instead of evaluating whether [the victim] was a true threat—or was simply scared of being robbed . . . [the officer] fired his weapon without warning or provocation.").

Sylvester's subjective beliefs. The proper legal inquiry is an objective one, and an officer's subjective beliefs cannot "make an objectively unreasonable use of force constitutional." Graham, 490 U.S. at 397, 109 S. Ct. at 1872. So even if Mr. Scott's retreat actually put Deputy Sylvester in fear of imminent harm, we cannot rely on an officer's subjective belief that his life was in danger "to objectively determine the reasonableness of his actions." Perez, 809 F.3d at 1220. Instead, we are confined to objective "facts and circumstances." Id. Given the officers' knowledge that the door to Apartment 114 was hollow, Deputy Sylvester's subjective belief that Mr. Scott moved behind this hollow door as if to fire is not objectively reasonable, particularly when Mr. Scott's movement was entirely consistent with retreat into his home. And in any case, blindly accepting Deputy Sylvester's beliefs as objectively reasonable at the summary judgment stage draws an impermissible inference in his favor. Any ambiguity surrounding the fact of Mr. Scott's retreat should have been resolved in favor of the plaintiffs. See Perez, 809 F.3d at 1217. It is the job of a jury to decide why Mr. Scott was backing inside his home. So too must a jury decide whether Deputy Sylvester's subjective belief was objectively reasonable.

In addition to these Fourth Amendment concerns, the District Court's conclusion that deadly force was reasonable here also plainly infringes on the Second Amendment right to "keep and bear arms." See District of Columbia v.

48

Heller, 554 U.S. 570, 592, 635, 128 S. Ct. 2783, 2797, 2821–22 (2008) (finding that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," and concluding that a ban on handgun possession and use for self-defense in the home violates this constitutional guarantee).  If Mr. Scott was subject to being shot and killed, simply because (as the District Court put it) he made the "fateful decision" to answer a late-night disturbance at the door to his house, and did so while holding his firearm pointed safely at the ground, then the Second Amendment (and Heller) had little effect.

B.    Warrantless Raid

The Fourth Amendment's protections are, and always have been, at their apex in the home.  See Kyllo v. United States, 533 U.S. 27, 34, 121 S. Ct. 2038, 2043 (2001) (describing the home as "the prototypical . . . area of protected privacy"); Wilson v. Layne, 526 U.S. 603, 610, 119 S. Ct. 1692, 1697 (1999) ("The Fourth Amendment embodies th[e] centuries-old principle of respect for the privacy of the home."); United States v. U.S. Dist. Ct. for E.D. Mich., 407 U.S. 297, 313, 92 S. Ct. 2125, 2134 (1972) ("[P]hysical entry of the home is the chief evil against which the . . . Fourth Amendment is directed.").  The Constitution guarantees "the right of a man to retreat into his own home and there be free from unreasonable government intrusion."  Silverman v. United States, 365 U.S. 505,

49

511, 81 S. Ct. 679, 683 (1961). Mr. Scott did nothing more than exercise this right when police officers converged on his home without a warrant and killed him.

The officers argued—and the District Court held—that this warrantless intrusion was constitutional under the "knock and talk" exception to the Fourth Amendment's warrant requirement. A knock and talk is a consensual encounter between police who seek to gather information and a civilian, which takes place at the civilian's home.[13] See United States v. Smith, 688 F.3d 730, 734 (11th Cir. 2012). In Florida v. Jardines, 569 U.S. __, 133 S. Ct. 1409 (2013), the Supreme Court discussed the legal basis for the knock and talk exception.[14] It stated that a knock and talk is authorized by longstanding social custom, which creates an implied license for a "visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. at 1415. The Court emphasized that knock and talks, when conducted in this way, are allowed "precisely because [it] is 'no more than any private citizen might do.'" Id. at 1416 (quoting Kentucky v. King, 563 U.S. 452, 469, 131 S. Ct. 1849, 1862 (2011). This Court has recognized the same legal basis for knock and talks. See United States v. Walker, 799 F.3d 1361, 1363 (11th Cir. 2015) (per curiam).

---

[13] As I've described, there was no talk here. This was a knock and shoot.

[14] Jardines framed the issue, but it was not the first Supreme Court case to discuss the legal basis for the knock and talk exception to the Fourth Amendment. See, e.g., Kentucky v. King, 563 U.S. 452, 469–70, 131 S. Ct. 1849, 1862 (2011).

When officers exceed the scope of the implied license for visitors to approach and knock, however, they may no longer claim shelter under the knock and talk exception to the Fourth Amendment's warrant requirement.  In Jardines, the officers exceeded the scope of the implied license by bringing a drug-sniffing dog onto the defendant's porch.  133 S. Ct. at 1416 & nn.3–4.  The Supreme Court said "[t]here is no customary invitation to do that"; whereas "a visitor knocking on the door is routine," a visitor acting like the officers "would inspire most of us to— well, call the police."  Id.  at 1416.  The Court's decision turned on the officers' violation of "background social norms," which showed that the scope of the license was exceeded.  Id.  And it noted that the scope of the license was not exceeded merely because a drug-sniffing dog was used—rather, "a typical person would find it a cause for great alarm . . . to find a stranger snooping about his front porch with or without a dog."  Id. at 1416 n.3 (quotation omitted).  This Circuit has also recognized that exceeding the scope of a knock and talk is illegal.  See Walker, 799 F.3d at 1363.

The officers in Mr. Scott's case try to shoehorn their tactics into the knock and talk exception, saying that they only intended to ask for information as visitors, and they would have left Apartment 114 if no one had answered.  The District Court and the panel accepted these statements and, in the process, rejected the plaintiffs' claims.  But the facts, properly viewed in the light most favorable to the

plaintiffs, tell a very different story. Unlike consensual visitors, the officers: (1) approached Mr. Scott's home at 1:30 a.m.; (2) tactically surrounded the only exit; (3) drew loaded guns; and (4) repeatedly slammed on the door without identifying themselves. These aggressive tactics did not fit into the implied license to approach and knock. Just like Jardines, there is no customary invitation to do that. Rather, seeing people outside your door at 1:30 a.m., in the dark, holding loaded guns, would be "a cause for great alarm" and would "inspire most of us to[] call the police." Jardines, 133 S. Ct. at 1416 & n.3. In circumstances like these, the implied consent underlying the knock and talk exception disappears, because no "background social norms" could possibly validate the officers' conduct. To the contrary, American social norms and laws empower people to protect themselves from armed intrusions into their homes.[15]

The officers here weren't ready to talk with Mr. Scott—they were ready for a raid.[16] Even setting aside the fact that Deputy Sylvester killed Mr. Scott before any talking at all, would Mr. Scott have been free to "refuse to answer any questions at any time," as is necessary for a knock and talk to be lawful? King, 563 U.S. at 470, 131 S. Ct. at 1862. Was he under "no obligation to open the

---

[15] Florida, the state where Mr. Scott was killed, has passed statutes known as "Stand Your Ground" laws, which allow the use of deadly force in self-defense without the need to retreat. See Fla. Stat. § 776.012(2) (2014). Even in the minority of jurisdictions that require retreat, there is typically an exception for one's home. See, e.g., Conn. Gen. Stat. Ann. § 53a-19(b) (2010).

[16] Indeed, that is exactly what one witness said he thought was happening.

52

door" even though the officers kept slamming on it in the middle of the night, so long and forcefully that even Mr. Scott's neighbors woke up and came outside? Id. at 469–70, 131 S. Ct. at 1862. Under the circumstances, I think not.

The concurrence's claim that these officers, who tactically surrounded Mr. Scott's home with their guns loaded, were there to greet Mr. Scott and chat, Conc. Op. at 25, is flatly inconsistent with its other claim that the officers were entitled to conclude that the armed motorcyclist may have been inside Apartment 114. Conc. Op. at 8–9, 12. The concurrence tries to have it both ways: for the excessive-force violations, it says the officers had every reason to think there was an armed and dangerous criminal in Apartment 114. Then for the knock and talk violation, it says the officers were just there for a friendly talk with people who "were not suspects." Conc. Op. at 7. Which is it?

The combination of police tactics used here is egregious. As far as I can tell, no Court of Appeals has reviewed a knock and talk case involving all the aggressive tactics used here, namely: (1) approaching well after midnight; (2) taking tactical positions to the sides of a home's only exit; (3) drawing guns; and (4) forcefully knocking without identifying themselves. Cases that seem to come to the attention of the courts, for the most part, involve officers using one of these tactics during a purported knock and talk. Even in isolation, tactics like those used by the officers here have met with criticism.

For instance, <u>United States v. Lara-Mondragon</u>, 516 F. App'x 771 (11th Cir. 2013) (per curiam), is an unpublished case from this Circuit that addressed only one of the tactics used here.[17]  The officers arrived at the home of an armed suspect, and the suspect fled into his home.  <u>Id.</u> at 771–73.  The officers assumed positions "along both sides of the residence," rather than on the doorstep.  <u>Id.</u> at 771–72.  This Court considered whether the officers' positioning made the knock and talk illegal, but found it did not because the suspect fled into his home after seeing police and was known to have a gun, which raised officer safety concerns.[18] <u>Id.</u> at 773.  We also approved the knock and talk because "no weapons were drawn" by police during the encounter.  <u>Id.</u>  Thus, even when three of the four aggressive tactics seen in this case were not used, we still suggested that the outcome could have been different if the officers had drawn guns.

While the concurrence dismisses what I say here by pointing out that I "rely" on out-of-circuit cases, I do not.  Conc. Op. at 26.  That said, I do find value in looking at how knock and talk cases are evaluated across the country.  And other courts have stressed the importance of police not drawing their guns during

---

[17] <u>Lara-Mondragon</u> is an unpublished opinion.  That being the case, I do not rely on it as binding precedent.  It is not.  Rather, the decision represents one of the few times our Court has addressed the permissibility of a knock and talk when the officers used any of the tactics seen here.  It therefore gives some context to how similar facts have been addressed by this Court.  Our Court often resolves qualified immunity questions in unpublished decisions.

[18] Our facts are different.  Mr. Scott was not a suspect, was not known to be armed when the police surrounded his door, and did not know police were outside.

54

information-gathering, consensual knock and talks. See, e.g., United States v. Gomez-Moreno, 479 F.3d 350, 355 (5th Cir. 2007) ("The purpose of a 'knock and talk' is not to create a show of force . . . nor to raid a residence."); United States v. Thomas, 430 F.3d 274, 278 (6th Cir. 2005) ("Thomas responded to a simple knock and request, not an order to emerge or the threat of firearms."); United States v. Spence, 397 F.3d 1280, 1284 (10th Cir. 2005) (concluding that a knock and talk did not constitute a seizure partly because the officers "did not display their weapons at any time"). The lack of support for conducting knock and talks with drawn guns is hardly surprising, given that a knock and talk is, by definition, a consensual encounter. See Smith, 688 F.3d at 734. Having a gun pointed at you removes the possibility of consent. Demonstrating this principle, I have found only one (unpublished) Circuit case approving a knock and talk where an officer drew his gun before knocking, and that court's approval was grudging. See United States v. Flores-Castaneda, 384 F. App'x 364 (5th Cir. 2010). And even for this one case, the court noted, "if the officers truly were uncertain about whether criminal activity was taking place inside a house [as is required by the knock and talk exception], they would not approach it with guns drawn." Id. at 368. While the Fifth Circuit said it "might well" find the knock and talk unreasonable in the first instance, it deferred to the district court's credibility determinations and

factual finding because it was bound by the standard of review for a suppression hearing.[19] Id. at 368–69.

The lateness of the hour also affects the reasonableness of a purported knock and talk. It is one thing to "openly and peaceably, at high noon, [] walk up the steps and knock on the front door." United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir. 1991) (quoting Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964)). It is another to go to a person's door in the middle of the night. American "law and legal traditions long have recognized the special vulnerability of those awakened in the night by a police intrusion at their dwelling place." United States v. Jerez, 108 F.3d 684, 690 (7th Cir. 1997). For example, in United States v. Lundin, 817 F.3d 1151 (9th Cir. 2016), officers conducted a knock and talk at 4:00 a.m. Id. at 1154. The court concluded that this tactic exceeded the scope of the implied license to approach and knock because "unexpected visitors are customarily expected to knock on the front door of a home only during normal waking hours," and there was no evidence that the officers had a reason for knocking that "a resident would ordinarily regard as important enough to warrant an early morning disturbance." Id. at 1159; see also United States v. Wells, 648 F.3d 671, 680 (8th Cir. 2011) (treating the fact that a knock and talk was conducted

---

[19] The District Court received evidence in Flores-Castaneda. We have no credibility findings to defer to here, because this district court ruled on summary judgment, and we review summary judgment rulings de novo. Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

at 4:00 a.m. as a factor showing unreasonableness); United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008) ("This [knock and talk] began between 2:30 and 3:00 in the morning, a time which must be taken into consideration when analyzing the coerciveness of the encounter." (emphasis added)). Florida courts also recognize that a late-night knock and talk may be coercive.[20] See, e.g., Hardin v. State, 18 So. 3d 1246, 1248 (Fla. 2d DCA 2009).

The concurrence says the cases I've cited do not apply here because those cases involved officers "using a coercive show of force" to enter homes without warrants. Conc. Op. at 26. Then, in comparing this case to Gomez-Moreno, the concurrence concludes that the officers' actions here "do not rise to the level of a 'show of force'" because (1) Deputy Sylvester "did not have a helicopter hovering overhead"; and (2) although the hour was late, the lateness did not make the officers' actions a "raid" because "the lights were on in the apartment." Id. at 27. I was not aware that private citizens could immunize themselves from police raids by simply flipping a light switch. Neither did I know that the police could avoid a "show of force" by leaving their helicopters at home.

---

[20] In Walker, this Court rejected a claim that lateness alone rendered a knock and talk illegal "in light of all the circumstances surrounding the officers' actions." 799 F.3d at 1364. Specifically, the lights were on inside the house; a light was on inside a car parked next to the house; and there was a person visibly slumped over the car's steering wheel. Id. at 1362, 1364. Walker is factually distinguishable, and at any rate concerned only one of the four aggressive police tactics used here. Walker may mean that the lateness of a knock and talk is not dispositive, but it does not mean lateness is not a relevant factor in judging reasonableness.

Considering all of the circumstances here, the aggressive tactics used exceeded the scope of the implied license to approach Mr. Scott's home and knock. The police's warrantless intrusion therefore violated the Constitution. Perhaps if this purported knock and talk had only been late at night (as in Walker), or had only involved the officers assuming tactical positions (as in Lara-Mondragon), we would have a different case. But the officers here did all of these things: (1) approached Mr. Scott's home at 1:30 a.m.; (2) tactically surrounded his only exit; (3) drew loaded guns; and (4) repeatedly slammed on the door without identifying themselves.[21] Although there are court rulings addressing different aspects of the behavior here, I found no case in which law enforcement did all of these things at once. The concurrence says I have not cited cases that are factually similar to this one. See Conc. Op. at 26–27. There are not a lot of cases like this, and I hope that is because police don't often shoot and kill innocent people who answer a knock at their door. It is the job of this Court to identify cases in which unconstitutional police tactics led to the senseless loss of life, and then let juries sort out how things went wrong.[22]

*    *    *

---

[21] These are not the actions of consensual visitors like "the Nation's Girl Scouts." Jardines, 133 S. Ct. at 1415.

[22] Enforcing the legal limits of knock and talks "may mean that the police use a tactic like 'knock and talk' somewhat less frequently, but that may be the price of compliance with the Fourth Amendment." United States v. Johnson, 170 F.3d 708, 718 (7th Cir. 1999).

58

I appreciate that police must make difficult decisions in tense situations. And that is why qualified immunity often shields them from suit. But there are limits to this doctrine. When police clearly violate a person's constitutional rights, as here, it is our role to confront that violation of the law and to ensure as best we can that it is not repeated. I don't believe the panel's summary affirmance performed that role. Instead, it gave a pass as reasonable to the actions of police in surrounding a randomly selected home in the dead of night, occupied by someone not a suspect; drawing loaded weapons; pounding on the door until the beleaguered occupant opened it; and then shooting him on sight, only because he was holding a gun. If these actions are constitutional, as the panel suggests, then the Second and Fourth Amendments are having a very bad day in this Circuit.

I respectfully dissent.

JILL PRYOR, Circuit Judge, with whom WILSON, MARTIN, and ROSENBAUM, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I join in full Judge Martin's thorough and thoughtful dissent. I write separately to add an observation about the incentives we create for police officers, and the guidance we provide for district courts, when we cloak fast-acting officers with qualified immunity based on unreasonably escalated circumstances that they alone create.

Even though Andrew Scott was not a suspect in any crime, Deputy Richard Sylvester and his fellow officers—with no reasonable justification for doing so— assumed tactical positions partially obscured from view, with guns drawn, at Mr. Scott's apartment door in the middle of the night and pounded loudly and insistently on the door without announcing themselves. Mr. Scott, understandably startled, came to the door with his gun in his hand, ready to defend himself if necessary. What transpired between the moment the door cracked open and the moment Deputy Sylvester fatally shot Mr. Scott spanned no more than three seconds. Viewing the evidence in the light most favorable to Mr. Scott, he, with his gun pointed at the floor, had time only to open his door and then quietly begin to retreat inside before Deputy Sylvester fired three bullets into his body, killing him.

Deputy Sylvester and his fellow officers created a situation in which anyone they would confront behind that door would feel panicked. There was absolutely no objectively reasonable justification for this escalation by the officers, as Judge Martin explains in her dissent. The district court nonetheless held, based on the "totality of the[se] circumstances," that "it was not unreasonable for Sylvester to believe that his life was in danger in the *instant* the door opened and to *immediately* take action in self-defense." Summary Judgment Ord., Doc. 73 at 32 (emphasis added).[1] The panel, without any additional explanation, agreed. I cannot. When police unilaterally manufacture alarm and urgency that the situation at hand clearly does not warrant, the law does not—and must not—grant them qualified immunity for a deadly split-second decision.

To be sure, in analyzing an officer's entitlement to qualified immunity we must view the situation from the eyes of a reasonable officer "on the scene who is hampered by incomplete information and *forced* to make a split-second decision between action and inaction," *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1334 (11th Cir. 2004) (emphasis added), in "circumstances that are tense, uncertain, and rapidly evolving," *Graham v. Connor*, 490 U.S. 386, 397 (1989). But here, Deputy Sylvester almost certainly would have avoided a forced split-second deadly

---

[1] I refer to numbered entries on the district court's docket as "Doc."

decision had he and his fellow officers not unreasonably contrived the tense, uncertain, and rapidly evolving circumstances at Mr. Scott's door.

I also am wholly unconvinced by the district court's reasoning that "Sylvester knew that the motorcyclist who had eluded him might be armed" so "[i]t was therefore reasonable for him to believe in that split second that Scott might indeed be the motorcyclist whom the officers sought because when Scott opened the door Sylvester saw a man holding a gun." Doc. 73 at 32-33. Construing the evidence in the light most favorable to Mr. Scott, any "knowledge" Deputy Sylvester had about whether the motorcyclist who sped past him earlier in the night was armed was nothing more than a hunch. Earlier, an armed assault and battery suspect had driven *a* motorcycle. Sometime later, about five miles away, Deputy Sylvester saw *a* motorcycle speed by in the dark. Deputy Sylvester testified that he could not identify the make, model, or color of the speeding motorcycle. Neither Deputy Sylvester nor any other officer identified *any* shared characteristic between the first motorcycle or driver and the second. It borders on meaningless to say that Deputy Sylvester "knew" that the speeding motorcyclist "might be armed."

Moreover, it defies logic to extrapolate from Deputy Sylvester's mere speculation about the connection between these two incidents that he *reasonably* identified Mr. Scott as this criminal motorcyclist from earlier in the night. Mr.

62

Scott had a gun.  So too does approximately one in three American households.

*See* Scott Horsley, *Guns in America, by the Numbers*, NPR (Jan. 5, 2016),

http://www.npr.org/2016/01/05/462017461/guns-in-america-by-the-numbers.  By

Deputy Sylvester's own testimony, there was nothing that linked Mr. Scott to the

crimes Deputy Sylvester was investigating.[2]  How could it have been objectively

reasonable for the mere presence of a handgun, a common household item, to

trigger the identification on which the district court relied?  Would Deputy

Sylvester have been justified in assuming that any person who happened to appear

at his door with a gun—in the middle of the night, in response to a jarring

pounding on the door—was the perpetrator about whom he was seeking

information?  I can hardly imagine a shakier foundation upon which to base the

split-second use of deadly force.

We have never before held that police can, without justification, provoke a

panic, and then hide behind it by claiming that "everything happened fast."

Deposition of Deputy Sylvester, Doc. 50-2 at 111.[3]  Nor should we now.  Deputy

---

[2] The concurrence makes much of the fact that a motorcycle and another vehicle registered to the same owner with an address in a different city were parked in front of the door to Mr. Scott's apartment.  But the officers conceded that Mr. Scott was not a suspect.  Nothing prevented the officers from approaching Mr. Scott's door to conduct a routine knock and talk to obtain information about the motorcycle parked nearby.  But as I describe here and as Judge Martin explains in detail in her dissent, Deputy Sylvester's conduct far exceeded the scope of a proper knock and talk.

[3] I would have a very different view of this case under different facts.  If the officers had conducted a true knock and talk and Mr. Scott had lunged out the door wielding a gun, Deputy

Sylvester and his fellow officers say they were approaching Mr. Scott as a member of the community, not as a known criminal or even a suspect or person of interest. Indeed, in Deputy Sylvester's own words, the officers merely intended to "knock[ ] on that door . . . . to get information." *Id.* at 118. The mere fact that Mr. Scott answered the door with a lawfully carried gun at his side could not reasonably have changed the officers' approach once they laid eyes on him. Instead of setting up such a show of force that the neighbors perceived the event as a raid and then reacting immediately to the sight of Mr. Scott with the use of deadly force, reasonable officers should have proceeded slowly and deliberately with their original plan.

The panel stamps a seal of approval on the district court's theory that, because everything happened so fast, the officers' actions were reasonable. I am deeply troubled by an analysis that rewards officers with qualified immunity when they move faster, rather than slower, in circumstances that do not in and of themselves warrant a vertiginous tactical approach. It simply cannot be that where, as here, the facts we must credit demonstrate that the officers alone created urgency and escalated the situation to an approach akin to a raid, without any

---

Sylvester very well may have been entitled to qualified immunity for his use of deadly force. He also may have been entitled to qualified immunity if the undisputed facts demonstrated that Mr. Scott's actions contributed to the "tense, uncertain, and rapidly evolving" circumstances. *Graham*, 490 U.S. at 397. But neither is the case here.

64

reasonable justification, those very circumstances entitle the officers to qualified immunity.[4]

Respectfully, I dissent from the denial of rehearing en banc.

---

[4] I hope that district courts will not draw such a conclusion from the panel's decision. Although unpublished opinions from this Court are non-precedential, I recognize that, for practical purposes, they provide guidance for our district courts even though they are not binding authority. But the panel's decision here, like all unpublished decisions, is "persuasive only insofar as [its] legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007). District courts may consider whether the panel's legal analysis is persuasive. In my view, it isn't.